UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RESEA PROJECTS APS | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CAUSE NO. 5:21-CV-1132-JKP |
| | § | |
| RESTORING INTEGRITY TO THE | § | |
| OCEANS, INC. AND KIERAN KELLY | § | |
| *Defendant*. | § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, EXPEDITED DISCOVERY, AND ENTRY OF PROTECTIVE ORDER

TO THE HONORABLE COURT:

### INTRODUCTION

1.      Plaintiff ReSea Project APS seeks preliminary injunctive relief to squelch Defendants' legitimate expressed concerns regarding its business practices because they are allegedly false. But Plaintiff fails to show that the speech is even false or other elements of its claims. Moreover, the equities and the public interest do not support its request for injunctive relief. Accordingly, this Court should deny the motion.

### BACKGROUND[1]

2.      Kiernan Kelly founded Restoring Integrity to the Oceans ("RIO") in 2019. After a lifetime in commercial fishing, he began to see the deleterious effect of plastic in the oceans and founded RIO to make a change. RIO's goal is to reclaim and recycle plastic that has made its way into oceans and waterways around the world. RIO partners with locals and empowers them to depollute their own local environment. RIO purchases the reclaimed plastic and pays its local

---

[1] The majority of the background is taken from the affidavit of Kieran Kelly. See Exhibit A. Exhibits to the affidavit are cited as "Exhibit-x."

{00757210}

partners by the pound. RIO partners with Logistics Plus, Inc., who provides support in transporting the collected plastic to recycling centers around the world. In return for this support, Logistic Plus, Inc. is permitted to claim some of RIO's plastic collections as part of Logistics Plus, Inc.'s environmental sustainability model. RIO has sought out other partners such as Logistics Plus, Inc. who can provide a necessary service to RIO.

3.      In its motion, ReSea alleges it competes in the same marketplace as RIO. This is not correct. ReSea, as it set forth, organizes local fishermen to collect plastic, which ReSea then sorts, packages, tags, and takes to a waste bank for weighing. ReSea then tokenizes that plastic on blockchain. ReSea monetizes these tokens by selling them to companies around world who can use the purchase to offset the companies' own plastic production. The plastic itself is not sold to ReSea's customers, only the token. In essence, what ReSea's customers are buying is a weight of plastic recovered from the oceans and properly disposed of.[2] As ReSea put it, its customers "leverage their plastic-removal commitments to meet their individual sustainability goals and/or support their sustainable brand profiles. *See* Breck Decl., at ℙ 6. To make an analogy, ReSea is selling reclaimed plastic stock

4.      RIO on the other hand does not sell reclaimed plastic stock. Instead, it sells the actual plastic it collects from the oceans and rivers and sells it directly to recyclers. RIO does offer offsets, but only to companies that can provide services to RIO in return.

5.      Beginning in April 2021, RIO purchased several thousand bags of plastic from an individual named Febri Heryanto. Heryanto who had solicited RIO months earlier on the prospect of RIO buying plastics he represented were collected from the ocean by fishermen. *See* Exh. A-2

---

[2] As an example, *see* Exhibit A-1  Pres Release, Stoli Group, Stoi Honors World Oceon Day Announcing Partnership with ReSea Project to Fight Ocean Plastic Pollution (June 8, 2021) Stoli® Honors World Ocean Day Announcing Partnership with ReSea Project to Fight Ocean Plastic Pollution (prnewswire.com))

(screenshots of Kieran's WhatsApp communication with Heryanto). At no time did Heryanto or his associates represent that the plastics being sold had been collected by ReSea. In fact, Heryanto represented that he collected the plastic from fishermen.

6.     In May 2021, Heryanto delivered a load of bagged plastic to RIO's warehouse in Jakarta. The majority of the bags had tags containing ReSea's name and a number sequence. These bags weighed significantly more than what a bag of that size would typically weigh. Initially, Heryanto claimed that the bags were wet either from rain or insufficient dry out time. However, after measures to extract water was ineffective, Kelly opened a few bags and found stones. He also found other adulterants in other bags. This included high quality, but cleanly cut, sections of rope and fishing net, which Indonesian fisherman would not treat in such a way. It also included oil that was primarily distributed at the top of the bags near the opening. He also discovered that the majority of the bags contained comparatively hard to sell plastics. He also was informed that ReSea's bags were also found at an illegal dumpsite on the banks of the Cisdane River in Tangerang, Baten, Indonesia, just south of the Jembatan Cisdane Kali Baru bridge. He traveled to the area and observed bags wearing ReSea's tag, similar to those RIO had been sold by Febri Heryanto.

7.     Kelly investigated, in part, by speaking to ReSea affiliated personnel. On September 12, 2021, he exchanged emails with Ann Sofie Gade, a General Manager of Resea in an effort to alert ReSea to the conditions of the plastic sold by Febri to RIO and the bags on the riverbank. Of note, in that email, Ms. Gade admitted that ReSea had been unable to enter into Indonesia due to the pandemic. See Exh. A-3 (Ann Gade email). From ReSea's Facebook page, it appears that they were unable to reach Indonesia until November 2021. See Exh. A-4 (2021-11-12 Post on ReSea's Facebook page).

{00757210}

8.      In a later telephone call, he spoke with Gade and an individual believed to be Klaus Hein Andersen, who represented himself as the CEO of ReSea's parent company, and informed ReSea of the condition of the bags Heryanto had sold RIO and the bags he observed on the river banks. In that call, Klaus acknowledged that they did not have any ReSea personnel in Indonesia and relied entirely on their local agents. He also admitted that ReSea's bags were supposed to be taken from the waste bank directly to be burned. He claimed he did not know how it was that ReSea's bags or why ReSea's bags were being resold were being discovered on the riverbank.

9.      Although, Kelly initially agreed to provide ReSea with the location on the river where ReSea's bags were found, I later reconsidered based on the disclosure that ReSea intended to deliver the plastic to be burned in light of the the effect that practice has on the air quality of Jakarta. He delayed in sharing the location and instead had the bags collected for recycling.

10.     ReSea claims that it is able to use the blockchain technology to track and trace the plastic collected. However, per ReSea's website and press releases state that their traceability is limited to the plastic's journey from the ocean to the waste bank, and never mentions tracing that occurs after the plastic leaves the waste bank.[3]  In fact, ReSea states on its website that it delivers the plastic to local waste banks, who in turn distribute the plastic waste for recycling and "waste handling."[4] The fact that its thousands of pounds of plastic could be removed from one of its waste banks and sold to RIO is evidence of the limits of ReSea's efforts to trace their collected plastics. RIO does not participate on the VeChain platform that ReSea claims is uses to track and inventory their plastic. Therefore, for purposes of their tracking, once their plastic was sold to RIO it was no longer traceable by ReSea or DNV

---

[3] *See generally,* Certified Cleanup | Proof of Impact | Traceability (reseaproject.com), https://www.reseaproject.com/certification (last visited on Jan. 24, 2022).
[4] *See* FAQ | ReSea Project, https://www.reseaproject.com/faq ("What happens to the plastic waste ReSea Project collects?) (last visited on Jan. 2, 2022).

{00757210}

**STANDARD FOR TEMPORARY RELIEF**

11.     "A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Healthpoint, Ltd. v. Straus Pharmaceuticals, Inc.*, 273 F.Supp.2d 769, 778 (W.D. Tex. June 1, 2001) (citing *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997)). "A preliminary injunction may be granted *only* if the moving party establishes each of the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest." *Id.* "[A] motion for preliminary injunction should be denied when a court is required to resolve complex questions of fact and law and/or where money damages would adequately compensate a movant. *Id.* at 814. "The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." *Id.* (quoting (*GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984)).

**ARGUMENT & AUTHORITIES**

**I.    Preliminary injunctive relief is not justified.**

**A. ReSea has failed to show a substantial likelihood of success on the merits.**

**1) Lanham Act Section 43(a) – False Advertising**

12.     A section 43(a) false advertising claim requires evidence of: (1) a false or misleading statement of fact about a product; (2) such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate

commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) (emphasis added). Plaintiff falters on the first step.

13.     Although Plaintiff identifies about twenty statements of fact that it alleges are false, Plaintiff never actually provides any evidence that each statement is false (or that all the statements are even capable of being determined to be false—more on that later). One factual claim that Plaintiff appears to rely on to support falsity is the claim that:

> RIO purchased thousands of bags of ReSea Project-reclaimed plastic, and then falsely claimed that RIO recovered those bags from the hydrosphere.

Motion, p. 6. But Plaintiff never explains how RIO's process for reclaiming plastic from the oceans—by paying fisherman to collect and deliver plastic to it—shows the falsity of Kelly's claims that ReSea is dumping plastics it claims to have disposed of were actually dumped back into the ocean by ReSea. Indeed, the mere fact that RIO is being sold bags of plastics collected by fisherman that were purportedly delivered by ReSea for disposal raises serious fact questions as to why the bags were not actually disposed of after purported delivery by ReSea.[5]

14.     To be sure, ReSea also purports to have an audit report from the DNV that finds that ReSea's tracing system is still in compliance with its standards, that three bags of plastic were properly delivered by ReSea to a waste bank, and that there is no evidence that ReSea added adulterants to the bags. But that audit report has not been disclosed to Defendants or the Court and should cannot be considered reliable evidence at this stage of the case. And again, Plaintiff does not argue or explain how the report's purported findings make each of the twenty statements false.

15.     Moreover, one of ReSea's general managers admitted that ReSea has been unable

---

[5] Further, Plaintiff disingenuously implies that RIO bought the plastics knowing that it was in ReSea certified bags, but never provide any actual evidence to support the implication.

to enter Indonesia due to the COVID-19 pandemic. And the head of ReSea's affiliate company also acknowledged that there were no ReSea personnel in Indonesia. These admissions call into question how ReSea can verify that the plastic waste is actually disposed of, and not dumped back into the oceans.

16.     And even assuming that ReSea's internal investigation is correct that ReSea's tracing system is in compliance with DNV standards and delivered the three bags to a waste bank— that report only further calls into question ReSea's entire business model. The question then becomes, what is the actual value of the services ReSea is selling to its customers and the Earth's oceans if ReSea can (for a profit) collect plastic waste from the ocean, sell credits for collecting the plastic waste and deliver it for disposal, but then the adulterated, plastic waste ultimately ends right back up in the ocean? Further, there is evidence that ReSea delivers the plastic for burning at the waste bank, which is not an environmentally acceptable way of disposing of the waste.

17.     Relatedly, Plaintiff has not established that all of the challenged statements are actionable statements of fact, which are actionable under section 43(a), instead of statements of opinion, which are not. *Pizza Hut*, 227 F.3d at 469–97. To be an actionable statement of fact, the "statements at issue must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Id.* at 497. A statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification. *Id.* And indeed, allegations of greenwashing and ReSea being a "fraudulent company" are justified even if ReSea's program works as intended. ReSea would be selling services that do not actually result in the cleaning of the oceans in a reliable way. Further, ReSea's practice of burning the collected plastics is not an environmentally friendly method for cleaning the planet.

18.     Because Plaintiff has not made any showing that the challenged statements are

false, or even true but misleading, it necessarily cannot show that the alleged misrepresentations are material or that it has suffered any injury.

### 2) Tortious Interference Claim

19.     Plaintiff complains that RIO is tortuously interring with its contracts with DNV, Hidden Sea, and VeChain. But Plaintiff does not allege, much less offer evidence, that any of the alleged customers have resulted in the breach by the customer of an obligatory portion of the contract. *See WickFire, L.L.C. v. Woodruff*, 989 F.3d 343, 354 (5th Cir. 2021); *see also Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 265 (Tex. App.—Corpus Christi 2006, pet. denied) (holding a defendant's mere encouragement of a third-party to end its contractual relationship with the tortious interference plaintiff is insufficient to support the cause of action where there is no evidence the third-party acted to terminate the contractual relationship). Indeed, Plaintiff has also failed to show that there are any terms of a contract that are able to be breached by its purported customers. *See Garcia v. Lion Mexico Consolidated, L.P.*, 2017 WL 9479195, at *10. Accordingly, Plaintiff has failed to show a likelihood of success on the merits.

### 3) Defamation Claim

20.     An actionable claim under Texas law for defamation requires, inter alia, the publication of a false statement of fact to a third party. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 743 (5th Cir. 2019). For the reasons discussed above under the Lanham Act claim, Plaintiff has not shown a likelihood of success on the merits that the statements are false or are capable of being proven false.

### B. ReSea has failed to show it will suffer irreparable harm in the absence of injunctive relief.

21.     Plaintiff's first argument on irreparable harm is that it doesn't need to prove it if it proves the falsity of the statements. That is a shaky proposition of law under Fifth Circuit

precedent. *See ADT, LLC v. Capital Connect, Inc.*, 145 F.Supp.3d 671, 695–95 (N. D. Tex. 2015).

But even assuming that it is true, Plaintiff's reliance is misplaced as Plaintiff has not shown a

likelihood of success on showing the falsity of the challenged statements. Because there is no

substantial likelihood of success on the falsity of the statements, the First Amendment undoubtedly

protects them, even if the statements merely amount to commercial speech. *See 44 Liquormart,*

*Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996).

      22.     Moreover, there is no evidence of irreparable harm. Plaintiff complains of speech.

Plaintiff has offered no evidence that RIO is a competitor for the market targeted by ReSea or that

any of ReSea's customers have indicated they intend to stop using ReSea's services. "A showing

of a possibility of irreparable harm is not enough; the threat of irrepearable harm must be likely."

*Heritage Pacific Fin., LLC v. Shelton Investigations, LLC*, 2009 WL 4983810, at *5 (E.D. Tex.

Dec. 14, 2009). The only concrete damages alleged by Plaintiff are the costs of a DNV audit. But

Plaintiff does not even give the cost of the audit or explain how damages will be insufficient.

**C. ReSea has failed to show it an injunction is in the public interest.**

      23.     Speech on matters of public concern is. Substantial questions have been raised by

Defendants regarding whether Plaintiff's business practices. Further Plaintiff touts itself as a leader

in the market for reclamation of plastics. Its business practices deserve as much sunshine as

possible, even if from a competitor. As the Supreme Court has explained:

> The commercial marketplace, like other spheres of our social and
> cultural life, provides a forum where ideas and information flourish.
> Some of the ideas and information are vital, some of slight worth.
> But the general rule is that the speaker and the audience, not the
> government, assess the value of the information presented. Thus,
> even a communication that does no more than propose a commercial
> transaction is entitled to the coverage of the First Amendment.

*44 Liquormart*, 517 U.S. at 503 (quoting *Va. State Bd. of Pharamcy v. Va. Citizens Consumer*

*Council, Inc.*, 425 U.S. 748, 762 (1976)).s

**D.  ReSea has failed to show it an injunction is in the public interest.**

*24.*    Further, given the complex factual issues presented by the case, it would be inappropriate to grant Plaintiff the scope of preliminary relief it seeks. *Healthpoint*, 273 F.Supp.2d. at 814. It not only seeks the removal of speech, but a prior restraint on future speech that it has not shown to be false. In addition, Plaintiff further seeks an order requiring corrective speech, which is disfavored before a final determination on the merits. *Id.*

**II.    Defendants will agree to reasonable measures for the preservation of evidence.**

25.    Defendants have maintained and preserved the ReSea tagged bags of plastic waste and will consent to an inspection of those bag by third party retained by ReSea and subject to the Courts supervision of any inspection and testing.

**III.    There is no need for the severely expedited discovery proposed by Plaintiff.**

**IV.**    As for Plaintiff's claim for the need of expedited discovery, that too should fail. Plaintiff has failed to show that any preliminary relief is justified and that any harm is imminent or irreparable. Instead, the Court should enter a scheduling order, including discovery on a reasonable timeframe. But if the Court allows for expedited discovery, Defendant similarly requests certain discovery as part of the process. *See* Exhibit B. Defendants also request depositions of Anne Sofie Gade and Klaus Hein Anderson.**Defendants object to the entry of the standard Western District of Texas protective order.**

26.    Defendants object to Plaintiff's request for entry into a protective order prior to the production of audit and investigation documentation. Particularly because the documents that are being withheld are perhaps the only evidence of Plaintiff's allegations. Moreover, Plaintiff trumpets the "traceablity" of the plastics it collects and that Plaintiff's and DNV's audit process verifies chain of custody as part of its marketing campaign. *See generally* Exh. A. If Plaintiff considers this transparency such a keystone of its business model, it is curious that Plaintiff wishes to keep such material protected.

**PRAYER**

27.    Defendant Restoring Integrity to the Oceans, Inc. and Defendant Kieran Kelly pray

that this Court deny the motion for a temporary restraining order and preliminary injunction.

Defendant prays for all other relief at law and in equity to which it may be entitled.

Respectfully submitted,

/s/ Joseph Hoelscher

**Joseph Hoelscher**
State Bar No. 24042972
joe@hgclaw.com
**HOELSCHER GEBBIA CEPEDA, PLLC**
3030 Nacogdoches Road, Suite 222G
San Antonio, Texas 78217
Phone: 210–222-9132
Fax: 888-519-8229
*Lead Counsel for Defendants*

and

/s/ Christopher M. Karl

**Christopher M. Karl**
State Bar No. 24070035
ckarl@valdeztrevino.com
**Joseph E. Cuellar**
State Bar No. 24082879
jcuellar@valdeztrevino.com
**VALDEZ & TREVIÑO,**
**ATTORNEYS AT LAW, P.C.**
Callaghan Tower
8023 Vantage Drive, Suite 700
San Antonio, Texas 78230
Phone: 210–598–8686
Fax: 210–598–8797
*Counsel for Defendants*

{00757210}

**CERTIFICATE OF SERVICE**

I do hereby certify that the foregoing instrument was served on the following counsel this

24th day of January 2021, pursuant to Rule 5 of the Federal Rules of Civil Procedure, via the email:

Marc D. Katz
DLA Piper, LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Marc.Katz@us.dlapiper.com

&

Allissa A.R. Pollard
1000 Louisiana Street, Suite 2800
Houston, Texas 77002
Mark.Waite@dlapiper.com
*Counsel for Plaintiffs*

       /s/ Joseph E. Cuellar
**Joseph E. Cuellar**

{00757210}