UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RESEA PROJECT APS,

    *Plaintiffs*,

v.                                        No. SA-21-CV-1132-JKP

RESTORING INTEGRITY TO THE
OCEANS, INC., and KIERAN KELLY,

    *Defendants*.

## MEMORANDUM OPINION AND ORDER

Before the Court is a *Second Emergency Motion for Preliminary Injunction* (ECF No. 83). Defendant Restoring Integrity to the Oceans, Inc. ("RIO") is without counsel and is currently in default in this case. It has filed no response to the motion. Defendant Kelly proceeds pro se and has filed no formal response to any motion other than the motion for sanctions even though he remains active in the case overall. *See* ECF No. 84. The Court previously construed the response to the motion for sanctions as contesting the factual basis of Plaintiff's asserted claims. *See* ECF No. 87. The Court thereafter set the motion for hearing. *See* ECF No. 91. Having conducted an evidentiary hearing on January 12, 2023, the Court is prepared to rule. For the reasons that follow, the Court grants the motion and issues a preliminary injunction in this case.

## I. MOTION FOR PRELIMINARY INJUNCTION

Plaintiff is a private company formed under the laws of Denmark with its principal place of business in Denmark. *See* Pl.'s Verified Second Am. Compl. ("SAC") (ECF No. 35) ¶ 1. RIO is a Texas corporation with its principal place of business in San Antonio, Texas, and Defendant Kelly is RIO's founder and chief executive officer. *Id*. ¶¶ 2-3. Through its operative pleading, Plaintiff asserts four claims against each defendant: (1) defamation rising to the level of defamation *per se*; (2) tortious interference with existing contracts; (3) false advertising in violation of the

Lanham Act, 15 U.S.C. § 1125(a)(1); (4) tortious interference with prospective business relations; and (5) business disparagement. *See id.* ¶¶ 85-116.

Through the instant motion for preliminary injunction, Plaintiff seeks to enjoin Defendants from "making any false or misleading statements regarding ReSea Project, its services, or its affiliates, including but not limited to" four specific categories of statements (1) dumping waste or reclaimed plastic into the hydrosphere,[1] (2) adding material to collected plastic for purpose of increasing weight and charges to customers, (3) committing fraud against its customers, and (4) engaging in greenwashing.[2]  ECF No. 83 at 30-31. Last month, the Court deferred ruling on the motion until it could hold a hearing on the factual dispute presented by the parties.

## A. Applicable Law

The Federal Rules of Civil Procedure specifically govern preliminary injunctions and temporary restraining orders. *See* Fed. R. Civ. P. 65. The primary difference between the two is whether "all interested parties had an opportunity to participate, thus allowing for full presentation of relevant facts" and this difference affects the appealability of the resulting order. *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. Unit A 1981). While Fed. R. Civ. P. 65(b)(1) permits courts to issue a TRO without notice to adverse parties in specified circumstances, Rule 65(a)(1) precludes issuance of a preliminary injunction without notice to such parties.

"The purpose of a preliminary injunction [(or TRO)] is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction or TRO, the movant must demonstrate the following equitable factors: "(1) a substantial likelihood of success on the merits, (2) a substantial

---

[1] For purposes of this case, the Court understands the hydrosphere to encompass the surface waters of the earth such as rivers, lakes, seas, and oceans.

[2] As defined by Plaintiff at the hearing, greenwashing is a pejorative term used to describe a deceptive corporate practice to present an environmentally responsible public image through misleading or deceptive publicity.

threat of irreparable injury if the injunction is not issued, (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) the grant of the injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *accord Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). Stated differently, a movant "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And for purposes of issuing a preliminary injunction, the irreparable injury must occur "during the pendency of the litigation." *Justin Indus., Inc. v. Choctaw Secs., LP,* 920 F.2d 262, 268 n.7 (5th Cir. 1990).

"A preliminary injunction is an extraordinary remedy and should only be granted if the [movant has] clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (internal quotation marks omitted). Granting such "injunction is to be treated as the exception rather than the rule." *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 769, 777 (W.D. Tex. 2001). Courts do not award such an extraordinary remedy "as of right." *Winter*, 555 U.S. at 24. Each case requires the courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Id*. (citation omitted). Whether to grant or deny a preliminary injunction lies within the sound discretion of the district courts. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). And when, "exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).

Given the limited purpose served by a preliminary injunction and "the haste that is often

necessary if those positions are to be preserved, a preliminary injunction is customarily granted on

the basis of procedures that are less formal and evidence that is less complete than in a trial on the

merits." *Univ. of Tex.*, 451 U.S. at 395. Accordingly, a movant "is not required to prove his [or

her] case in full at a preliminary-injunction hearing." *Id*. To show a substantial likelihood of suc-

cess on the merits, a movant "must present a prima facie case, but need not prove [entitlement] to

summary judgment." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582

(5th Cir. 2013).

**B. Analysis**

Plaintiff argues that there is a substantial likelihood that it will prevail on its false advertis-

ing claim asserted under the Lanham Act. ECF No. 83 at 25-28. It also focused on that claim during

the hearing.

Nearly eight decades ago, "Congress enacted the Lanham Act." *POM Wonderful LLC v.

Coca-Cola Co.*, 573 U.S. 102, 107 (2014). While the Act (codified as 15 U.S.C. §§ 1051-1141n)

primarily concerns trademark protection, it also protects competitors from false advertising. *See

id*. More specifically, it "creates a cause of action for unfair competition through misleading ad-

vertising or labeling. Though in the end consumers also benefit from the Act's proper enforcement,

the cause of action is for competitors, not consumers." *Id*. Addressing "commercial advertising or

promotion," § 43(a) of the Lanham Act provides:

> Any person who . . . uses . . . any . . . false or misleading description of fact, or false
> or misleading representation of fact, which . . . misrepresents the nature, character-
> istics, qualities, or geographic origin of his or her or another person's goods, ser-
> vices, or commercial activities., shall be liable in a civil action by any person who
> believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (format changed to reflect a single paragraph).

In general, a prima facie case of false advertising under the Lanham Act requires the plain-

tiff to establish five elements. *IQ Prod. Co. v. Pennzoil Prod. Co.*, 305 F.3d 368, 375 (5th Cir.

2002). There must be (1) a "false or misleading statement of fact" that (2) "either deceived or had the capacity to deceive a substantial segment of potential consumers." *Id*. Third, to be actionable, any deception must be "material, in that it is likely to influence the consumer's purchasing decision." *Id*. Fourth, the goods, services, or commercial activities must be "in interstate commerce." *Id*. Fifth and finally, "as a result of the statement at issue," there must be an injury to the plaintiff or the plaintiff "is likely to be injured." *Id*.

"The focus of the Lanham Act is on commercial interests that have been harmed by a competitor's false advertising." *Id*. (citation, internal quotation marks, and brackets omitted). "In order to obtain monetary damages or equitable relief in the form of an injunction, a plaintiff must demonstrate that the commercial advertisement or promotion is either literally false, or that if the advertisement is not literally false, it is likely to mislead and confuse consumers." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (citation, internal quotation marks, and brackets omitted). "If the statement at issue is shown to be literally false, the court must assume that it actually misled consumers, without requiring any evidence of such deception from the plaintiff." *IQ Prod. Co.*, 305 F.3d at 375. In other words, for "literally false" statements, the second and third elements are satisfied. But if the plaintiff merely shows the statement "to be misleading, the plaintiff must also introduce evidence of the statement's impact on consumers, referred to as materiality." *Pizza Hut, Inc.*, 227 F.3d at 495. Stated differently, if the plaintiff merely shows the statement "to be misleading or ambiguous," then "the plaintiff must demonstrate actual deception through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests." *IQ Prod. Co.*, 305 F.3d at 375.

The essential question presented by a Lanham Act claim is "whether the challenged statement is one of fact . . . or one of general opinion. *Pizza Hut, Inc.*, 227 F.3d at 495-96. The former is actionable under the Act, whereas the latter is not. *See id*. "Bald assertions of superiority or

general statements of opinion cannot form the basis of Lanham Act liability." *Id*. at 496. To be actionable, "the statements at issue must be a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Id*. (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). "A statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986).

Use of technology and social media may be a means to present false and actionable statements under the Lanham Act. For instance, using "a domain name and Facebook page" to make false advertising statements is actionable under the Lanham Act. *Heartbrand Holdings, Inc. v. Whitmer*, No. SA-19-CV-358-HJB, 2021 WL 1947875, at *2 (W.D. Tex. May 14, 2021). Similarly, "hashtagging a competitor's name or product in social media posts could, in certain circumstances, deceive consumers," and thus be actionable under the Lanham Act. *Fraternity Collection, LLC v. Fargnoli*, No. 3:13-CV-664-CWR-FKB, 2015 WL 1486375, at *4 (S.D. Miss. Mar. 31, 2015).

While a "movant need not prove its case in a preliminary injunction context, a motion for preliminary injunction should be denied when a court is required to resolve complex questions of fact and law and/or where money damages would adequately compensate a movant." *Healthpoint, Ltd. v. Stratus Pharms., Inc.*, 273 F. Supp. 2d 769, 814 (W.D. Tex. 2001). And "[t]he burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits." *Id*. (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984)).

The parties are commercial competitors. Among other things, the Lanham Act makes one liable for using false or misleading facts to misrepresent the nature, characteristics, or qualities of

a competitor's services or commercial activities. Plaintiff lists numerous examples of "literally false and misleading statements made by Defendants." *See* ECF No. 83 at 26-27. Of course, not all listed examples need to qualify as false or misleading to show a likelihood of success. For the most part there is no question that the listed examples qualify as statements of fact that can be judged either as true or false through empirical verification.

By way of background information in the motion Plaintiff sets forth a lengthy dissertation on various alleged false information on social media and other alleged wrongs by Defendants. *See*, *generally*, *id*. at 2-24. And while, in general, the accuracy or falsity of the listed statements seems to ultimately come down to whether Plaintiff added outside material to increase the weight of collected plastic so as to overcharge customers, Plaintiff's efforts to connect the background in-formation to the specific listed statements leaves a bit to be desired. And, although not directly connected to that ultimate inquiry, Plaintiff points to an independent DNV investigation, which is summarized in a declaration provided with the SAC and relied upon in the motion for injunction. *See id*. at 6-7.

In that declaration, Henrik Breck, a co-owner of Plaintiff, explains Plaintiff's tracing sys-tem "that is backed by VeChain blockchain technology and is certified by DNV, the international accredited registrar and classification society that is headquartered in Høvik, Norway." ECF No. 35-1 ¶ 7. He further explains that the "certified tracing system is designed, in part, to help ensure that plastic material collected from a given water body is not mixed with other material after the initial bagging, up through delivery to local waste banks." *Id*. ¶ 9. He identifies a September 2021 email from Defendant Kelly, *see id*. ¶ 11, which states: RIO "collected lots of plastic with the last few months that was dumped into the rivers in bales and bags. Hundreds of tons of this plastic [belongs] to ReSea. . . . Plus for some strange reason oil was added to the bags of plastic after it was collected," *see* ECF No. 35-2 (copy of email). Kelly attached three photographs to the email.

*See* ECF No. 35-3 (copy of photos).

According to Breck, an internal investigation revealed "that the bags associated with the identification numbers in Mr. Kelly's photographs were properly delivered to the Bahasa Utama waste bank in or around August 2021." ECF No. 35-1 ¶¶ 13-14. Breck further avers that such "data is accurately reflected in a report dated October 14, 2021 that was independently prepared by DNV as part of its own onsite, semi-announced audit of ReSea Project's operations." *Id*. ¶ 14 (referring to Ex. A-4, a sealed exhibit that has since been struck from the record by ECF No. 76).

In its motion, Plaintiff cites to ¶ 14 of Breck's declaration to support its position that the independent audit by DNV (1) confirmed that Plaintiff's tracing system was in compliance with DNV's standards, (2) determined that the photographed bags had been properly delivered to the waste bank, and (3) "revealed no evidence that [Plaintiff] dumped reclaimed plastic back into the hydrosphere or added non-plastic material to bags of reclaimed plastic to increase the weight of the bags." ECF No. 83 at 6. But without reviewing the struck exhibit, that paragraph of the declaration does not quite go as far as Plaintiff indicates. Paragraph 14 supports the second proposition, but standing alone, it does not support the first or third propositions. Because the Court struck the previously sealed exhibit, *see* ECF No. 76, that exhibit is not properly before the Court and will not be considered. However, with the exception of an attached cover letter, Plaintiff remedied the evidentiary issue by providing a copy to Defendant Kelly and having the DNV report admitted at the hearing. *See* Pl.'s Ex. 18.

Plaintiff's internal investigation also revealed that Defendants had obtained bags of plastic from a third-party after Plaintiff delivered them to the Bahasa Utama waste bank. ECF No. 35-1 ¶ 16. After Defendants' initial email allegations to Plaintiff and the subsequent investigation and audit, Plaintiff explained to Defendants that it considered the serious allegations and revealed that its investigation showed their purchases of plastics rather than their independent collection from

the waterways. *See* ECF No. 35-8. Plaintiff also addressed the allegation of adding material to increase the weight of bags in three ways: (1) revealing that its investigation found no evidence of such actions; (2) its tracing system and quality control did not detect any such activity; and (3) the suggestion that someone would add oil, fishing nets, and ropes makes no sense when there are cheaper alternatives such as debris, dirt, and leaves, if someone was trying to cheat. *See id.* In response to these explanations, Defendants denied the "false claim of purchasing plastic" and maintained that they are "a hands on front line plastic waste recovery operation." *Id.*

Plaintiff, however, provides an email confirming that Defendants had bought bags of plastic that Plaintiff had delivered. *See* ECF No. 35-6. It also relies on a declaration that Kelly submitted in opposition to Plaintiff's prior motion for injunction. *See* ECF No. 83 at 7 (relying on ECF No. 18-1). In that declaration, Kelly admitted to obtaining tagged bags with Plaintiff's identification from a third-party. ECF No. 18-1 ¶¶ 6-7. But Kelly also averred that he "was informed that [Plaintiff's] bags were also found at an illegal dumpsite" and that his personal observation confirmed what he had been told. *Id.* ¶ 12.

Breck then summarizes an ongoing social media blitz of false and negative information about Plaintiff on Defendants' social media accounts, including statements that Plaintiff has been illegally dumping plastic and is intentionally adding foreign material to bags of reclaimed plastics in order to increase their weight and charges to customers. ECF No. 35-1 ¶ 19. Plaintiff also provides screenshots of various social media posts by Defendants. *See* ECF Nos. 35-10 through 35-15.

Despite the list of twenty-one examples of what Plaintiff characterizes as "literally false and misleading statements," with citations to where the statements can be found in the record, Plaintiff, within its briefing, fails to take the obvious next step to directly explain why the listed statements are literally false. But, as discussed next, Plaintiff remedies this matter with sworn

witness testimony at the hearing.

Plaintiff presented testimony from two sworn witnesses, its General Manager of Operations, Ann Sofie Gade, and its current Chief Executive Officer, Soren Marcussen. Through mostly focused questioning, both witnesses provided credible testimony about Plaintiff's operations, and more importantly, about the truth or falsity of specific claims made by Defendants on social media. Ms. Gade testified that Plaintiff has never claimed to recycle 100% of plastics delivered to local waste banks. When Defendants first reached out to Plaintiff through email, Ms. Gade was confused and alarmed by the matters alleged therein, and immediately set upon investigating the matters to ascertain the truth of the allegations. That investigation ultimately led to the conclusion that Defendants had bought the plastic from a third-party, PT Daur, rather than having retrieved the plastic from a location where Plaintiff might have dumped it.

Mr. Marcussen likewise testified that Plaintiff took Defendants' initial allegations seriously, conducted its own independent investigation, reported the matter to DNV which conducted its own investigation, and both investigations ultimately found compliance with the DNV standards for collecting and delivering recovered plastic to local waste banks. Importantly, Mr. Marcussen verified various facts set out in in the September 21, 2021 email (ECF No. 35-8) from him to Defendant Kelly. He verified that Plaintiff's investigation found no evidence that its collected plastic waste had been found on dump sites. He verified that Plaintiff's investigation instead revealed that RIO had actually purchased Plaintiff's plastic waste from a local waste bank through a third-party, PT Daur. He verified that Plaintiff's investigation showed no evidence that its plastic waste contains added oil, nets, and ropes. He too was shocked by Defendants' initial allegations, but adamantly denied deliberately dumping anything anywhere based upon investigations of the allegations. He pointed out that despite many attempts to obtain information from Defendants that might support their allegations, Defendants have provided nothing to support their allegations.

Through pointed questioning by counsel, Mr. Marcussen also dissected the truth of statements made by Defendants in a social media post on October 7, 2021. First, he dispelled the notion that Plaintiff is owned by a massive pharmaceutical company. He testified that the alleged owner is neither massive nor in the pharmaceuticals industry. He testified that Plaintiff has never been investigated for corporate fraud as Defendants state in the social media post. He testified that he was not aware of any adding of nets or ropes to Plaintiff's collected plastic waste. He testified that there is no truth to the allegation of added weight or that Plaintiff has engaged in corporate greenwashing.

It is Plaintiff's burden to show entitlement to a preliminary injunction. This entails making a necessary showing for the four, well-established equitable factors.

### 1. **Likelihood of Success**

First, Plaintiff must show a likelihood of success. And, for its claim under the Lanham Act, this means that Plaintiff has shown a likelihood to establish each of the five elements for such claim set out in *IQ Products Company v. Pennzoil Products Company*, 305 F.3d 368 (5th Cir. 2002). The first element requires a "false or misleading statement of fact." *IQ Prod. Co.*, 305 F.3d at 375. Posts on social media can qualify as advertising statements. And, through the testimony of its witnesses, Plaintiff has shown that statements by Defendants are literally false.

For purposes of this preliminary injunction motion and based upon the evidence submitted, the Court finds the following statements of fact literally false: (1) Plaintiff put oil or other matter with collected plastic to make the bags heavier, (2) Plaintiff added material to collected plastic to make it look like local fishermen dumped the plastic, (3) Plaintiff has dumped or is dumping waste or reclaimed plastic into the hydrosphere; (4) Plaintiff has committed or is committing fraud against its customers, and (5) Plaintiff has engaged or is engaging in corporate greenwashing. The Court further finds as an alternative ruling that these statements are likely to mislead, confuse, or

deceive consumers.

As to the second element, there is a presumption of consumer deception when statements of fact are literally false. *See id.*; *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007). "If the statement at issue is shown to be literally false, the court must assume that it actually misled consumers, without requiring any evidence of such deception from the plaintiff." *IQ Prod. Co.*, 305 F.3d at 375. Based on the literal falsity of the statements, Plaintiff has satisfied the second element. Further, as to the alternate finding that the statements are likely to mislead, confuse, or deceive consumers, Plaintiff has presented credible testimony that the statements have misled, confused, or deceived consumers.

To be actionable under the Lanham Act, the third element requires that any deception be material – meaning that the false or misleading statements are likely to influence the consumer's purchasing decision. When statements are literally false, this element is also satisfied without any additional showing. Nevertheless, Mr. Marcussen testified that customers know of the statements by Defendants and that four customers have specifically delayed entering into any arrangement with Plaintiff until this cloud over Plaintiff's reputation has been lifted through trial. Plaintiff has shown the deception to be material.

The fourth element requires that the goods, services, or commercial activities be in interstate commerce. Commercial activities include advertising and making disparaging statements about competitors on social media. Defendant Kelly has not denied that he and RIO caused the statements to enter interstate commerce by making the statements on the internet through social media platforms. At this point in time, "it is beyond debate that the Internet and email are facilities or means of interstate commerce." *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009). Making social media posts on the internet satisfies the interstate commerce element.

The fifth and final element requires an injury or likely injury to the Plaintiff from the

statement at issue. Plaintiff has presented evidence that it has been injured from the statements of Defendants in the form of lost or delayed business opportunities.

In short, Plaintiff has provided credible evidence to satisfy each element of a Lanham Act claim. Defendant Kelly provided no evidence to call into question the credibility of the witnesses or to otherwise tip the scales against finding that Plaintiff had carried its burden on this issue.

### 2. Likelihood of Irreparable Harm

When a party seeks an injunction for alleged violations of the Lanham Act, such party "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order." 15 U.S.C. § 1116(a). Because Plaintiff has made the requisite showing of a likelihood of success, it is entitled to the benefit of this rebuttable presumption regarding irreparable harm. Defendant Kelly has not rebutted that presumption. Accordingly, the Court finds that Plaintiff has shown a likelihood of irreparable injury.

### 3. Balancing the Equities

The balance of the equities favor Plaintiff. No one has "an equitable interest in disseminating a false advertisement." *Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*, 519 F. Supp. 3d 839, 855 (D. Or. 2021) (citing *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011)). The equitable interests for a party subjected to false advertising thus undoubtedly favor injunctive relief.

### 4. Public Interest

"A TRO or preliminary injunction is in the public interest whenever a plaintiff has established a reasonable likelihood of establishing that the defendant has engaged in false advertising in violation of the Lanham Act." *Id.* at 856. This is so "because the 'Lanham Act is itself a public interest statute intended to protect the consuming public and competitors from false and deceiving

statements which a company chooses to utilize in advertising its goods or services.'" *Id.* (quoting

*U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1242 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159

(9th Cir. 1982)). No one can reasonably dispute that "the public has an interest in receiving accu-

rate information and avoiding confusion in the marketplace." *See Osmose, Inc. v. Viance, LLC*,

612 F.3d 1298, 1321 (11th Cir. 2010). Furthermore, the Fifth Circuit has approved a lower court

finding "that the public is served when the law is followed." *Daniels Health Scis., LLC v. Vascular*

*Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013).

### 5. Conclusion

Plaintiff has shown that a preliminary injunction is warranted on the facts presented in this

case. The Court thus proceeds to consider other relevant matters.

## C. Bond

Having found that issuance of a preliminary injunction is warranted, the Court next con-

siders whether to require Plaintiff to post any bond. Rule 65(c) of the Federal Rules of Civil Pro-

cedure generally prohibits the issuance of a preliminary injunction unless "the movant gives secu-

rity in an amount that the court considers proper to pay the costs and damages sustained by any

party found to have been wrongfully enjoined or restrained." Not only is the amount of security a

matter of discretion, but courts "may elect to require no security at all.'" *Kaepa, Inc. v. Achilles*

*Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citation omitted). "The party against whom a preliminary

injunction is sought bears the burden of establishing a rational basis for the amount of the proposed

bond." *M-I LLC v. FPUSA, LLC*, No. SA:15-CV-406-DAE, 2015 WL 6738823, at *16 (W.D. Tex.

Nov. 4, 2015) (citing *AB Electrolux v. Bermil Indus. Corp.*, 481 F.Supp.2d 325, 337 (S.D.N.Y.

2007)), *adhered to*, No. SA:15-CV-406-DAE, 2016 WL 6088344 (W.D. Tex. Oct. 17, 2016).

Plaintiff requests that the Court require no bond. ECF No. 83 at 30. Defendant Kelly has

neither argued for a bond nor made any attempt to establish a rational basis for a bond amount. He

has made no effort to show how he might be damaged should the Court issue the requested pre-

liminary injunction. While he has complained generally throughout this litigation that an injunc-

tion would violate his First Amendment rights, "commercial speech receives First Amendment

protection" only when "the commercial speech is not false, deceptive or misleading." *United States*

*v. Simpson*, 741 F.3d 539, 550 (5th Cir. 2014) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463

U.S. 60, 69 (1983)). False or "misleading commercial speech receives no First Amendment pro-

tection." *Id*. Kelly and RIO are commercial competitors of Plaintiff, and their disparaging state-

ments qualify as false or misleading commercial speech. In these circumstances, the Court finds

that no bond is warranted.

**D. Contents and Scope of Injunction**

Rule 65(d) of the Federal Rules of Civil Procedure requires that every injunction state (A)

the reasons for its issuance and (B) "its terms specifically," in addition to (C) describing "in rea-

sonable detail" the conduct "restrained or required." Courts "must narrowly tailor an injunction to

remedy the specific action which gives rise to the order." *Daniels Health Scis., LLC v. Vascular*

*Health Scis., LLC*, 710 F.3d 579, 586 (5th Cir. 2013) (quoting *John Doe # 1 v. Veneman*, 380 F.3d

807, 818 (5th Cir. 2004)).

The conduct of Defendants that led to this preliminary injunction consists of commercial

activity of Defendants on social media platforms. The citizenship of Defendant Kelly is uncertain,

but he has ongoing personal contact with the United States through his company, RIO, and through

visits to his child who lives in Ohio. Despite the uncertainty of his citizenship, there is no doubt

that Defendant RIO is a corporation formed and operated under American laws. For purposes of

diversity jurisdiction and removal, the corporate defendant is" deemed to be a citizen of every

State" in which it has been incorporated, as well as "the State or foreign state where it has its

principal place of business." 28 U.S.C. § 1332(c)(1). And, for purposes of resolving the

preliminary injunction motion, the Court considers the corporate defendant to be a citizen of the

United States. Given the breadth of Defendants' social media presence essentially spanning around

the globe as far as the internet permits, effective injunctive relief must likewise span beyond the

borders of the United States.

It has long been held "that Congress in prescribing standards of conduct for American cit-

izens may project the impact of its laws beyond the territorial boundaries of the United States."

*Steele v. Bulova Watch Co.*, 344 U.S. 280, 282 (1952). And, as recognized by the Fifth Circuit:

> No principle of international law bars the United States from governing the conduct
> of its own citizens upon the high seas or even in foreign countries when the rights
> of other nations are not infringed. Congress has the power to prevent unfair trade
> practices in foreign commerce by citizens of the United States, although some of
> the acts are done outside the territorial limits.

*Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n*, 701 F.2d 408, 416 (5th Cir. 1983) (quoting

*Scotch Whisky Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 812 (7th Cir. 1973)). Governing the

conduct of an American corporation falls within these principles. *See id.*

Consistent with *Bulova*, "certain factors are relevant in determining whether the contacts

and interests of the United States are sufficient to support the" extraterritorial reach of American

law. *Id.* at 414. Three factors – "the citizenship of the defendant, the effect on United States com-

merce, and the existence of a conflict with foreign law" – "will necessarily be the primary elements

in any balancing analysis," but courts should not limit their "inquiry exclusively to these consid-

erations" and an "absence of any one of these [factors] is not dispositive." *Id.* With respect to the

effect on commerce, the Fifth Circuit has stated "that *some* effect may be sufficient." *Id.* at 414

n.8.

In this case, RIO is a United States citizen, whereas Kelly's citizenship is unknown, but he

is founder and an officer of that entity. False or misleading commercial statements made by a

United States corporation and its chief executive officer undoubtedly have some effect on United

States commerce and violates American law. No one has identified any conflict with foreign law that would arise by enforcing the Lanham Act against an American corporation even if such enforcement crosses the territorial boundaries of the United States. Each of the primary elements favor the extraterritorial application of the Lanham Act, and the Court knows of no other consideration that would tip the scales of this balancing analysis in the other direction.

As the Supreme Court has concluded, when "there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction." *Bulova*, 344 U.S. at 289. By using social media platforms to make their false or misleading statements, Defendants did not confine their commercial activities to the territorial limits of a foreign nation. The natural ripples of such statements disparaging a competitor has some effect on United States commerce.

The Court will consider all of these matters as it fashions an appropriate preliminary injunction. Another factor that it considers is set out in the next section.

**E. Prior Restraint**

Plaintiff seeks to enjoin Defendants from making certain statements in the future. This necessarily involves imposing a prior restraint upon Defendants. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation, emphasis, and internal quotation marks omitted). Of course, not all prior restraints are impermissible. *See Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (discussing "First Amendment-protected expression without enacting proper safeguards").

Courts may protect First Amendment rights in the commercial speech context by not proscribing all commercial speech, but instead limiting the injunction to false or misleading statements. *See United States v. Smith*, 657 F. Supp. 646, 658 (W.D. La. 1986), *aff'd*, 814 F.2d 1086

17

(5th Cir. 1987). Such a limited injunction does not encroach upon First Amendment protected speech. In a different context, the Fifth Circuit has noted it "has indicated that the legislature is to be accorded considerable deference in regulation of misleading advertising even to the extent of permitting prior restraints." *U.S. Postal Serv. v. Athena Prod., Ltd.*, 654 F.2d 362, 367 (5th Cir. Unit B Aug. 1981). For these reasons, although the Court recognizes concerns regarding imposing a prior restraint on speech, the Court finds that it may permissibly restrict the dissemination of false and misleading commercial speech without running afoul of First Amendment protections even when prohibiting future commercial speech.

## II. PRELIMINARY INJUNCTION

Plaintiff has made a sufficient showing of the following matters to warrant the issuance of this preliminary injunction:

> (a) Plaintiff and RIO are competitors that offer similar services, i.e., removing plastic from the hydrosphere in exchange for a fee;
>
> (b) Defendants have a substantial social media following and use their social media accounts to advertise their business;
>
> (c) using their social media platforms, Defendants have made literally false statements of fact and/or misleading statements about Plaintiff and its services;
>
> (d) to obtain wide dissemination of their social media statements, Defendants use hashtags and tag influential persons and organizations, as well as existing and potential customers of Plaintiff;
>
> (e) the false and misleading statements of Defendants are material and harmful to Plaintiff; and
>
> (f) Plaintiff has been damaged by the false and misleading statements.

These matters and the entirety of this Memorandum Opinion and Order provide the required reasons for issuing this preliminary injunction.

Defendants RIO and Kelly are specifically restrained and enjoined from directly or indirectly making any false or misleading commercial statements about Plaintiff or Plaintiff's services,

including but not limited to statements regarding Plaintiff (1) putting oil or other matter with collected plastic to make the bags heavier, (2) adding material to collected plastic to make it look like local fishermen dumped the plastic, (3) dumping waste or reclaimed plastic into the hydrosphere; (4) committing fraud against its customers, and (5) engaging in corporate greenwashing.

Plaintiff has requested that the Court not require any bond for this case and the Court exercises its discretion to set the required bond at $0.00. In other words, no bond is required for this injunction to take effect. This preliminary injunction **shall be effective, immediately**, and, absent further order of the Court, will continue until a trial on the merits is completed and final judgment rendered. In accordance with Fed. R. Civ. P. 65(d)(2), this preliminary injunction binds "only the following who receive actual notice of it by personal service or otherwise:" (A) Defendants RIO and Kelly; (B) their "officers, agents, servants, employees, and attorneys, and" (C) "other persons who are in active concert or participation with anyone described in" subparagraphs (A) or (B).

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the *Second Emergency Motion for Preliminary Injunction* (ECF No. 83) and **ISSUES** the preliminary injunction set forth herein. **To facilitate timely receipt of this Memorandum Opinion and Order, the Court hereby directs the Clerk of Court to email a copy of this Memorandum Opinion and Order to Defendant Kelly at the email previously used in this case.**

**SIGNED this 17th day of January 2023.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**

19