UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RESEA PROJECT APS,

     *Plaintiff*,

v.                                  **Case No. SA-21-CV-1132-JKP**

RESTORING INTEGRITY TO THE
OCEANS, INC., and KIERAN KELLY,

     *Defendants*.

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is *Plaintiff ReSea Project APS's Motion for Sanctions and Grant of Default Judgment and Permanent Injunction Against Both Defendants* (ECF No. 146). Plaintiff supports its motion with a 1,000-page exhibit (ECF No. 146-1), a supplement (ECF No. 147), and two exhibits attached to the supplement (ECF No. 147-1 and 147-2). Defendant Restoring Integrity to the Oceans, Inc. ("RIO") is without counsel and is currently in default in this case. Defendant Kieran Kelly proceeds pro se and has filed no response to the motion even though he was quite active in the case overall prior to the motion. As discussed later, the Court will consider Kelly's response (ECF No. 141) to the Order to Show Cause (ECF No. 140) in conjunction with the instant motion for sanctions. The motion is ripe for ruling.

### I. BACKGROUND

The history of this case is well-known to both sides. It has been hotly litigated from the outset. But it seemed to go into a downward spiral once defense counsel withdrew from the case. Commencing with spoliation of evidence just prior to the termination of the attorney-client relationship, Defendant Kelly has engaged in ongoing abusive and sanctionable conduct. The Court has considered various sanctions during the course of this case. In its most extensive discussion and analysis of the sanctionable conduct to that point, it viewed Plaintiff as seeking a quick victory without methodically addressing lesser sanctions. *See ReSea Project ApS v. Restoring Integrity to*

*the Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2022 WL 17724419, at \*7 (W.D. Tex. Dec. 15, 2022) (found at ECF No. 87 at 14). Despite the sanctionable conduct at that time, the Court "strive[d] to strike a balance between being too harsh, too quickly and being too lenient." *See id*. Since that ruling, Plaintiff has made efforts to advance this case. But Defendant Kelly has not responded in kind. Instead, he has responded with additional wrongdoing and ever-increasing belligerence.

As examples of his recalcitrance, Plaintiff points to his refusal to appear for his deposition until ordered to do so, he then lied repeatedly during that deposition, later interfered with Plaintiff's attempts to depose other witnesses, and has continued violating the Preliminary Injunction entered in this case even though the Court held him in contempt earlier in 2023. The Court need not list the sanctionable conduct of Kelly. In previously denying the earlier sanction request for default (to be followed by a motion for default judgment), it noted that "Plaintiff certainly alleges conduct that might justify sanctions," but "has not provided enough to justify the requested sanctions." *Id*. After conducting a hearing, it later issued a preliminary injunction to restrain and enjoin Defendants

> from directly or indirectly making any false or misleading commercial statements about Plaintiff or Plaintiff's services, including but not limited to statements regarding Plaintiff (1) putting oil or other matter with collected plastic to make the bags heavier, (2) adding material to collected plastic to make it look like local fishermen dumped the plastic, (3) dumping waste or reclaimed plastic into the hydrosphere; (4) committing fraud against its customers, and (5) engaging in corporate greenwashing.

*ReSea Project ApS v. Restoring Integrity to Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2023 WL 222244, at \*11 (W.D. Tex. Jan. 17, 2023).

The Court thereafter held a hearing on a motion to compel and a motion for contempt filed by Plaintiff. This resulted in multiple court orders. First, the Court memorialized that it "orally granted the motion for contempt with a written order to follow" and deferred ruling on the motion to compel. *See* Order Continuing Trial and Addressing Matters Raised at Motion Hearing (ECF No. 125). Second, in the later ruling on the motion to compel, the Court addressed whether Kelly

had violated a court order, stated that "it has no difficulty in finding that Kelly did violate the March 2022 order," further found that "such finding may function as a deterrent for similar abuses of the discovery process," but "the Court with[eld] any opinion as to the extent of such violation and any repercussion therefrom remains unclear." *ReSea Project APS v. Restoring Integrity to the Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2023 WL 3029268, at *2 (W.D. Tex. Apr. 20, 2023).

Following the order on the motion to compel, both parties made numerous filings. Ultimately, the Court issued an Order to Show Cause (ECF No. 140), which summarized the events leading up to its issuance. Although Plaintiff viewed Kelly's actions as worthy of entry of default against him, it suggested that, at a minimum, the Court should have Defendants show cause why they should not be sanctioned. The Court thus ordered Kelly to show cause in writing why the Court should not sanction him. It specifically "place[d] Defendant Kelly on notice that imposed sanctions may include the severe sanction, default judgment, monetary sanctions made payable to Plaintiff and/or to the Court, and any lesser sanction that may suffice under the circumstances." Because the Court had previously orally found Kelly in contempt but withheld issuing a written order, it ordered that it would "combine any issued sanctions for contempt into a ruling on filings submitted in response to this Order to Show Cause." It thus set a deadline for Plaintiff to file a renewed motion that aggregates all bases for sanctions. It allowed a response to such motion, but also stated that such response "need not reiterate matters set out or provided with his response" to the show cause order.

Kelly thereafter filed a response (ECF No. 141), which has been docketed as an Advisory to the Court. Given the seriousness of the sanctions sought for his alleged transgressions and abuses, one would expect a significant effort to show cause why the Court should not sanction him. But in essence the response does little more than disagree with prior orders and findings of the Court, attack the credibility and truthfulness of counsel for Plaintiff, and contend that Plaintiff is engaged as a criminal enterprise hacking his accounts among other claimed nefarious deeds.

Kelly begins by maintaining that his initial social media posts were accurate. This viewpoint conflicts with the Court's finding that, "through the testimony of its witnesses, Plaintiff has shown that statements by Defendants are literally false." *ReSea Project ApS v. Restoring Integrity to Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2023 WL 222244, at *7 (W.D. Tex. Jan. 17, 2023). He then contests the position that Plaintiff and RIO are competitors, because (1) RIO does not exist and has never operated in Indonesia and (2) he is an environmental activist who charges much less than the rate charged by ReSea. The Court has already found the parties to be competitors under the Lanham Act. *See id.* at *4. His protestations to the contrary provide no basis to find that he has not engaged in sanctionable conduct. As for the existence of RIO, Kelly took steps to close that entity after this case commenced. Similarly, his protestations that he has never intentionally deleted any emails is contrary to statements made by his own retained counsel before they left this case.

Kelly also claims that ReSea has misled the Court about whether ReSea had provided an entire file marked as "attorney's eyes only." He then complains that he finds "it extremely disturbing that [his] complaint to the Texas Bar against [Plaintiff's] attorneys who have been lying since the beginning of this case, is to be treated as a threat." He then denies interfering with any discovery. He discusses his attempts to remove a hacker from a Facebook account and submits without support that "this is being orchestrated by the criminal enterprise in Denmark, better known as RESEA/PACK." He further submits that this "criminal enterprise" is merely manipulating and deceiving the Court with their lies. He complains about the attacks on his freedom of speech. Although he states that he is willing to provide his tax returns, he does not do so. He also discusses a forensic examination of his emails that "found absolutely nothing incriminating," but does not provide the forensic examination.

Plaintiff also filed three advisories before filing the instant motion for sanctions. As part of the show cause order, the Court directed Defendants to present two individuals for depositions and set the deadline for Plaintiff to move for sanctions as September 18, 2023, or within twenty-eight

4

days of the depositions, whichever was later. In its first post-show cause advisory, Plaintiff stated that Defendants had not yet made either individual available for deposition, had received no meaningful response as to Keith Flitner, and Rico Guerrero had recently indicated that he was no longer affiliated with defendants and may be willing to appear for deposition. *See* ECF No. 142. The second advisory indicated that Guerrero agreed to appear for deposition in October 2023. *See* ECF No. 143. The third advisory indicates that Guerrero did appear for deposition, but Plaintiff had still received no indication that Flitner would appear for any deposition. *See* ECF No. 145.

Plaintiff thereafter filed the instant motion for sanctions on November 10, 2023. It seeks entry of default against Kelly and entry of default judgment against both Defendants. Mot. at 44. It also seeks "any financial sanctions the Court deems just and appropriate." *Id*. As for default judgment, it submits that it has shown Defendants to be liable under the Lanham Act and Texas law (defamation/defamation per se, tortious interference, and business disparagement). It submits that it is entitled to entry of a permanent injunction with a similar scope as the existing preliminary injunction. It seeks economic damages of $172,278 under the Lanham Act and Texas law. It seeks reputational damages under Lanham Act and Texas law in an amount of at least $500,000. Citing Tex. Civ. Prac. & Rem. Code § 41.008(b), it seeks exemplary damages under Texas law of $844,556—calculated at double economic damages plus the noneconomic damages. It also seeks treble statutory damages under the Lanham Act in an additional amount of $1,344,556 ($672,278 x3-$672,278). Finally, it seeks pre- and post-judgment interest, as well as unspecified attorney fees and costs under the Lanham Act. Not including the latter items, Plaintiff seeks total damages in an amount of $2,861,390 through entry of default judgment.

## II. SANCTIONS

Plaintiff seeks sanctions under both the discovery rules and the inherent authority of the Court. "Federal courts have inherent powers which include the authority to sanction a party or attorney when necessary to achieve the orderly and expeditious disposition of their dockets."

*Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996)). Similarly, the Federal Rules of Civil Procedure provide authority for courts to sanction litigants for failing to obey discovery orders, appear for their own deposition, and preserve electronically stored information. *See* Fed. R. Civ. P. 37(b), (d), and (e). Each of these rules provide for entry of a default judgment as a sanction.

In general, sanctions are a discretionary matter whether imposed under a specific rule or through the inherent powers of the courts. *Calsep A/S v. Dabral*, 84 F.4th 304, 310 (5th Cir. 2023). And courts abuse their discretion when they fail "to employ the least severe sanction adequate to achieve the desired result." *Scaife*, 100 F.3d at 411 (addressing inherent power to sanction); *accord Gonzalez v. Trinity Marine Grp., Inc.*, 117 F.3d 894, 898 (5th Cir. 1997) (requiring "least severe sanction available" for sanctions imposed through the courts' inherent powers or under the discovery rules).

> In exercising its discretion in considering the imposition of sanctions for discovery violations, a district court should consider the following factors: (1) the reasons [for the discovery violations]; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances.

*United States v. Garza*, 448 F.3d 294, 299-300 (5th Cir. 2006). These same matters are relevant to invocation of the Court's inherent power to sanction.

While courts have "broad discretion in fashioning" sanctions, Fifth Circuit "caselaw imposes a heighted standard for litigation-ending sanctions." *Law Funder, LLC v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019); *accord Calsep A/S*, 84 F.4th at 310-11.Under this heightened standard, courts

> must make four additional findings to impose a litigation-ending sanction: (1) the discovery violation was committed willfully or in bad faith; (2) the client, rather than counsel, is responsible for the violation; (3) the violation "substantially prejudice[d] the opposing party"; and (4) a lesser sanction would not "substantially achieve the desired deterrent effect."

*Law Funder*, 924 F.3d at 758 (quoting *FDIC v. Conner*, 20 F.3d 1376, 1380-81 (5th Cir. 1994)).
With respect to "litigation-ending sanctions, 'dismissal with prejudice [ ] is appropriate only if the
refusal to comply results from willfulness or bad faith and is accompanied by a clear record of
delay or contumacious conduct.'" *Calsep A/S*, 84 F.4th at 313 n.8. (quoting *Conner*, 20 F.3d at
1380). Courts act within their discretion in choosing and imposing a litigation-ending sanction
"when a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities."
*Id.* (citations omitted).

In this case, Kelly has unquestionably demonstrated flagrant bad faith and disregard for his
responsibilities as a litigant and as one enjoined from certain actions by a preliminary injunction
issued by the Court. Further, he essentially provides little reason for his discovery violations and
other transgressions. He inaccurately states that he did not delete emails. He inaccurately states
that he has not hindered depositions. He seems to blame others rather than accept responsibility
for his own actions. He has violated multiple court orders, including the issued preliminary injunc-
tion. Prejudice in this case is substantial and apparent. Kelly's nonparticipation in discovery pre-
vented the case against him from proceeding in any meaningful way. Plaintiff has been unable to
progress this case to trial despite the Court's attempts to expedite the request for injunction with a
trial on the merits. At nearly every turn, Plaintiff faced resistance from Kelly. The Court has ex-
amined various sanctions and has found Kelly in contempt of the preliminary injunction issued in
this case. Given the substantial sanctionable conduct, the Court finds the resulting prejudice incur-
able with a continuance of trial. Based on the history shown in this case, Kelly has no intent to
proceed to trial on the merits while permitting Plaintiff to engage in normal discovery.

In recognition of the seriousness of the case-ending sanction of default judgment, the Court
specifically finds that Kelly willfully engaged in discovery misconduct and acted in bad faith
throughout this litigation. As he proceeds without counsel, there is no doubt where to place re-
sponsibility. Kelly is undoubtedly personally responsible for the discovery delays and other

sanctionable conduct in this case. The Court, furthermore, finds that no lesser sanction would sub-stantially achieve any desired deterrent effect. The prejudice to Plaintiff has been substantial.

As the Fifth Circuit has recognized, "discovery delays are serious, especially when they are part of a pattern." *Calsep A/S*, 84 F.4th at 313. A litigant's "noncompliance is doubly problem-atic when" he has ignored a court-issued warning." *Id*. at 314. Similarly, "like delays, a pattern of misconduct doesn't help." *Id*. This case has been replete with delays caused by Kelly. He has exhibited a pattern of misconduct since he terminated his retained counsel. That termination ulti-mately resulted in RIO being found in default for failures to comply with court orders and not obtaining counsel for the entity despite prior warnings that sanctions could be issued. *See ReSea Project ApS v. Restoring Integrity to the Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2022 WL 17724419, at *1 (W.D. Tex. Dec. 15, 2022) (discussing prior orders and sanction warning). In denying a prior request for case-ending sanctions, the Court stated that it "will entertain a later-filed motion for sanctions, should Kelly engage in further misconduct or if facts are revealed through discovery to fill gaps" noted at the time. *See id*. at *7.

Despite warnings of future sanctions, Kelly continued with his misconduct and the limited discovery Plaintiff did obtain from a former executive of RIO provided facts adding to the reasons for sanctioning Kelly. At this point, his level of misconduct does not require great consideration of lesser sanctions, *see Calsep A/S*, 84 F.4th at 315, even though this Court has considered various lesser sanctions since Plaintiff first raised his sanctionable conduct through motions to the Court. Courts are not always "required to consider *specific* alternative sanctions." *Id*. at 316. Given the facts here, including failures to follow orders and second chances, the circumstances do not war-rant "deep consideration of alternatives." *See id*. Instead, it is "plain that a lesser sanction wouldn't have done the trick." *See id*. Failures to heed court warnings while continuing to not comply with court orders may "allow a court to jump straight to litigation-ending sanctions." *Id*.

In this case, the Court has not jumped straight to the harshest of sanctions even when Kelly

has failed to heed court orders. It has continually given Kelly ample opportunity to comply with court orders, including the imposed preliminary injunction. Providing "a second or third chance is *itself* a lenient sanction, which when met with further default, may justify imposition of the ultimate sanction of dismissal with prejudice." *Id*. at 317 (cleaned up and omitting citation). In short, "a detailed consideration of lesser sanctions isn't required where, as here, a court appropriately concludes that a party's act was particularly egregious, part of a pattern of repeated violations, and—as evidenced by the wrongdoer's conduct—there's some indication that lesser sanctions would be futile or ignored." *Id*. That is precisely the circumstances in this case. Still, the Court has fully explored lesser sanctions. At some point, a default judgment is the only practical solution." *Id*. This case has reached that point.

For the reasons stated in this Memorandum Opinion and Order as well as prior orders of the Court and the present motion of Plaintiff, the Court finds that Kelly has engaged in sanctionable conduct, and that default judgment is the only appropriate sanction at this point.

### III. DEFAULT JUDGMENT

Under Fed. R. Civ. P. 54(c), the Court's entry of "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." In this case, the Verified Second Amended Complaint ("SAC") (ECF No. 35) provides the operative pleading. Plaintiff therein asserts five claims against both defendants: (1) defamation arising to level of defamation per se; (2) tortious interference with existing contracts; (3) violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) tortious interference with prospective business relationships; and (5) business disparagement. SAC ¶¶ 85-116. As a result of the actions leading to such claims, Plaintiff has suffered "harm and damages, including but not limited to increased costs, reputational harm, and lost business." *Id*. ¶ 90; *accord id*. ¶¶ 96, 104, 110-11, 116. As relief, Plaintiff seeks "all damages (including exemplary/punitive damages), pre- and post-judgment interest, corrective advertising, attorneys' fees and costs," as well as "permanent injunctive relief." *Id*. at 30-31.

Unless otherwise discussed herein, the Court finds that Plaintiff has satisfied needed evidentiary support for its claims as stated in the motion for sanctions. Defendants are liable under the Lanham Act. The Court fully explored Plaintiff's likelihood of success on this claim when issuing the existing preliminary junction. *See ReSea Project ApS v. Restoring Integrity to Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2023 WL 222244, at \*2-8 (W.D. Tex. Jan. 17, 2023). The record presented at the preliminary injunction hearing in conjunction with evidence presented with the current motion for sanctions and Defendants' admissions through their default support each element of Plaintiff's Lanham Act claim.

Defendants are also liable for defamation per se under Texas law because they have made false statements about Plaintiff's business, including that it has engaged in fraud and has polluted the environment, "that are so obviously harmful," to its business reputation. *See Hancock v. Variyam*, 400 S.W.3d 59, 63-64 & n.6 (Tex. 2013); *accord In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). Texas law thus allows the Court to presume general damages to Plaintiff, including "loss of reputation." *In re Lipsky*, 460 S.W.3d at 593. Nevertheless, although Courts may presume general damages under Texas law, special damages "are never presumed as they represent specific economic losses that must be proven." *Id*. Further, "even though Texas law presumes general damages when the defamation is per se, it does not 'presume any particular amount of damages beyond nominal damages.'" *Id*. (quoting *Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012)). Texas law requires evidentiary support for "[a]ny award of general damages that exceeds a nominal sum." *Id*.

Although the Court previously addressed Plaintiff's tortious interference with existing contracts claim through a prior motion to dismiss, it provided Plaintiff an opportunity to correct the pleading deficiency as to that claim. *See ReSea Project ApS v. Restoring Integrity to the Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2022 WL 565605, at \*1-2 (W.D. Tex. Feb. 23, 2022). The SAC addresses the prior pleading deficiency and provides a sufficient basis for finding Defendants liable

under such claim. Similarly, Defendants' admissions through default establish their liability for tortious interference with prospective business relations. Likewise, such admissions appear sufficient to establish their liability for business disparagement under Texas law.

As fully discussed when issuing the current preliminary injunction, *see ReSea Project ApS v. Restoring Integrity to Oceans, Inc.*, No. SA-21-CV-1132-JKP, 2023 WL 222244, at *9-11 (W.D. Tex. Jan. 17, 2023), Plaintiff is entitled to a permanent injunction of similar scope. Consistent with Fed. R. Civ. P. 65(d), the Court will set out the terms of such injunction in a contemporaneously issued Default Judgment.

As to damages and other matters, because each of Plaintiff's claims rely on the same essential facts, the issue is not so much whether Defendants are liable under any specific claim, but what is the extent of their liability. Each claim presents a basis for economic damages under the facts. Both the Lanham Act and Texas law also provide for reputational damages.

A brief overview of the Lanham Act appears prudent at this juncture. Under the Lanham Act, district courts have "considerable discretion in fashioning an appropriate remedy." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991) (citing 15 U.S.C. § 1117(a)), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). Even when entering a default judgment, a court may deny damages if it finds "no evidence to support an award of damages." *See CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 63 (5th Cir. 1992) (noting that the district court denied damages in such circumstances).

For violations of § 1125(a), plaintiffs "shall be entitled, subject to [two provisions inapplicable here on the facts], and subject to the principles of equity to recover . . . (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Further, when "assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." *Id*. Should the court "find that the amount of the recovery based on profits is either inadequate or

11

excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id*. But regardless, that "sum in either of the above circumstances shall constitute compensation and not a penalty." *Id*.

"An enhancement of damages may be based on a finding of willful [conduct] but cannot be punitive." *Taco Cabana*, 932 F.2d at 1127. To account for the "anomalous" situation when "an enhancement of damages, which implies an award exceeding the amount found 'compensatory,' must be 'compensatory' and not 'punitive,'" the Fifth Circuit has "suggested that enhancement could, consistent with the 'principles of equity' promoted in [§ 1117], provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." *Id*. And, as also recognized by the Fifth Circuit, the district courts have "superior capacity to discern the elements of equitable compensation." *Id*.

While the Lanham Act contains language concerning treble damages, such damages shall not be punitive. On the other hand, Texas law permits exemplary damages in some circumstances, but such damages "may not exceed an amount equal to the greater of" $200,000 or twice "the amount of economic damages" plus up to $750,000 in noneconomic damages. Tex. Civ. Prac. & Rem. Code § 41.008(b). At this point, the question is how these various provisions interact and apply to the same conduct by Defendants.

**A. Economic Damages**

For each of its claims, Plaintiff requests a single amount of economic damages. *See* Mot. at 36. In March 2022, it stated that its "lost business exceeds $100,000." *See* Decl. Breck (ECF No. 146-1, Ex. A; ECF No. 35-1) ¶ 24. Six months later, through a second declaration of Plaintiff's co-owner (Henrik Breck), Plaintiff stated that it has conservatively calculated its economic damages based on lost profits from three customers who either terminated an existing contract, declined to proceed with an agreed contract, or declined to renew a contract with Plaintiff. *See* Second Decl.

Breck (ECF No. 146-1, Ex. F) ¶¶ 7-9. Keeping with its overall conservative approach to calculating the economic damages, Plaintiff seeks lost profits from three customers totaling $166,278 for a two-year period. *See id.* ¶ 12. It also seeks a $6,000 fee for a special audit caused by Defendants false statements. *Id.* ¶ 14.

Although Plaintiff submits that it has "undoubtedly suffered further damage" from Defendants' wrongful actions, such as losing prospective customers due to the false and negative publicity, it does not seek such damages at this time. *Id.* ¶ 15. Nevertheless, it recognizes the difficulties in quantifying profits lost from such prospective customers and suggests that one measure—annualized revenue lost due to growth rate sharply slowing—yields another $267,000 in economic damages for a single year. *Id.* ¶¶ 11, 15. It also states that obtaining the sought permanent injunction would clear its name so that lost customers, both the three used to calculate economic damages and other prospective customers, return or commence business relationships with it. *Id.* ¶¶ 9, 16.

Through the submitted declaration, the Court finds that Plaintiff has suffered known economic damages of $172,278.

**B. Reputational Damages**

Plaintiff also seeks reputational damages of $500,000 based upon jury awards obtained in other cases. *See* Mot. at 37-39. While the Court has no disagreement that, under Texas law, "awards in similar cases" may be instructive when reviewing "an excessiveness challenge for factual sufficiency," *see Bearden v. LeClair*, No. 02-20-00177-CV, 2022 WL 3273598, at *19 (Tex. App. – Fort Worth Aug. 11, 2022, no pet.) (mem. op.); *accord Anderson v. Durant*, 550 S.W.3d 605, 620-21, 623 (Tex. 2018) (recognizing relevancy of comparisons of jury "awards in cases involving similar or more egregious behavior"), such similar cases do not of themselves satisfy Plaintiff's burden to show it is entitled to reputational damages or the amount of such damages. Texas law is clear that, while reputational damages are recoverable and are difficult to assess, there still must be evidence to find that reputational damages are warranted and to support the amount

of damages. *Anderson*, 550 S.W.3d at 621; *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017); *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 159-61 (Tex. 2014); *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002). Although Plaintiff relies on a presumption of reputational damages due to its claim of defamation per se, Mot. at 37, such presumption relates to nominal damages only, *see In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). For reputational damages that exceed "a nominal sum," Texas law requires evidentiary support. *See id*.

As to reputational damages under Texas law, Plaintiff merely relies on the presumption of such damages and comparing their requested amount of $500,000 to other cases. That is not sufficient. Nevertheless, Plaintiff has also submitted evidence of lost business that it does not claim as economic damages, at least in part, due to the difficulty in ascertaining the scope of such damages. It appears appropriate to consider such evidence to the extent it supports an award of reputational damages.

Texas law requires noneconomic damages to not exceed an amount that "would fairly and reasonably compensate" the plaintiff for its loss. *Bentley*, 94 S.W.3d at 606 (Tex. 2002) (addressing mental anguish as a type of noneconomic damage). Given their very nature, noneconomic damages must be determined through "the exercise of sound judgment," rather than "mathematical precision." *Id*. at 605. Similarly, Defendants' willful conduct permits an enhancement under the Lanham Act but only to the extent is needed to compensate an undercompensated plaintiff.

Ultimately, whether under Texas or federal law, the amount of reputational damages lies within the sound determination of the Court—as the finder of fact under the circumstances. The amount simply must be supported by the record and cannot be more than an amount that fairly and reasonably compensates Plaintiff for its lost reputation. Because so many things can affect the growth rate of a given business, the Court finds Plaintiff's growth rate analysis to be of limited assistance in determining the amount of reputational damages. However, it does view that analysis as setting an upper boundary for such damages. In light of Plaintiff's claimed economic damages

for known lost business ($166,278), which is undoubtedly intertwined with unknown lost business, the Court finds that amount to be an appropriate benchmark for the lower end of unknown lost business. It is reasonable to find that unknown lost business would at least equal the amount of known lost business.

Even with those benchmarks, there is a sizeable gap between the upper and lower end for reputational damages. While there is evidence to support a finding of noneconomic damages within that range, the better course under the circumstances is to make an enhancement under the Lanham Act for the undercompensated Plaintiff. And because the amount determined under the Lanham Act will fully, fairly, and reasonably compensate Plaintiff for its lost reputation, no calculation of noneconomic damages is specifically warranted for its state claims.

## C. Treble Damages under Lanham Act

For purposes of the Lanham Act, Plaintiff would have the Court combine the economic and noneconomic damages and then triple it for an additional amount of damages that works out to be twice the amount of the combined amount. Mot. at 41. But that is not precisely the way the treble provision of § 1117(a) of the Lanham Act works. That provision is not punitive in nature. It instead provides courts a basis to fully compensate a party for somewhat uncertain damages and, in doing so, it sets treble the amount of actual damages as the outer limit. Using the known economic damages ($172,278), the upper limit is $516,834. If the Court had calculated a specific amount of noneconomic damages in the preceding section, the upper limit would exceed $1,000,000. Regardless of the upper limit, however, there must be a compensatory basis for the Court to treble the actual damages.

In this case, the Court views trebling the actual damages to exceed $1,000,000 as going too far. On the other hand, using only the known actual damages as the basis for treble damages, the Court finds that amount ($516,834) as sufficient to fully compensate Plaintiff. It recognizes the inherent difficulties in assessing lost business due to the willful conduct of Defendants.

Accordingly, the Court finds that enhancing the actual damages by tripling the amount of known economic damages is warranted.

As applicable in this case, the Lanham Act is intended to fully compensate Plaintiff for the false advertising of Defendants. The Court's considerable discretion is to promote equity, fairness, and just compensation. While it is difficult to ascertain the full extent of damages resulting from the wrongful conduct of Defendants, the imprecision in this case does not merely flow from conduct of Defendants. From a purely compensatory viewpoint, the Court finds its calculations sufficient to fully compensate Plaintiff under the facts of this case. To be clear, the Court uses the enhancement provision of the Lanham Act to triple Plaintiff's actual damages. This means Plaintiff is entitled to $172,278 in economic damages, plus twice that amount ($344,556) as an enhancement to fully compensate it for its lost reputation that is difficult to quantify. Further, if pressed to calculate a specific amount of noneconomic damages for purposes of Texas law, the Court would utilize $344,556 as the proper amount.

Courts remain within their discretion under § 1117(a) when they "calculate[] the profits and lost profits in a rational way" and make an award that is not "clearly inadequate." *Dunkin' Donuts Inc. v. Mercantile Ventures*, 19 F.3d 14 (5th Cir. 1994). In light of "the broad discretion accorded the district court in deciding damages up to three times the amount of actual damages found," courts remain within their discretion when they award an amount of damages supported by the record even when "evidence of damages could have been more precise." *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1305 (5th Cir. 1997).

**D. Exemplary Damages under Texas Law**

Plaintiff also seeks maximum exemplary damages under Texas law. Mot. at 39-40. While that type of damages is available under Texas law, *see* Tex. Civ. Prac. & Rem. Code § 41.003(a), the standards for recovery of exemplary damages under § 41.003 only provide a discretionary basis for an award of such damages, *see id.* § 41.010(b) ("Subject to Section 41.008, the determination

of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact.") . While satisfying § 41.003 provides a path for exemplary damages, that path has obstacles to an ultimate award.

"Before making an award of exemplary damages, the trier of fact shall consider the definition and purposes of exemplary damages as provided by Section 41.001." *See id*. § 41.010(a). Texas defines "exemplary damages" as "any damages awarded as a penalty or by way of punishment but not for compensatory purposes." *Id*. § 41.001(5). Thus, as the trier of fact in this case, the Court recognizes that the purpose of the requested exemplary damages is to punish Defendants rather than to compensate Plaintiff.

Because § 41.008(b) sets a maximum amount for exemplary damages, the Court has discretion to award such damages up to that amount. *See id*. § 41.010(b). But it has no discretion to exceed the maximum amount or to award such damages in cases in which they are inapplicable under § 41.008(c). When "determining the amount of exemplary damages," the Court as the trier of fact in this case must "consider evidence, if any, relating to" six listed factors, including "the net worth of the defendant." *Id*. § 41.011. Further, "an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." *Id*. § 41.006.

Plaintiff, however, neither addresses the six factors of § 41.011 nor makes any attempt to allocate the requested exemplary damages between the two defendants. *See* Mot. at 39-40. It instead focuses exclusively on the § 41.003(a) standards for recovering exemplary damages—"malice" as defined by § 41.001(7)—before requesting maximum exemplary damages under § 41.008(b). *See id*.

The failure to attempt to allocate requested exemplary damages between the two defendants may be somewhat understandable given the relationship between the two defendants. Still, it seems that some specificity is warranted, even if merely to say that Plaintiff seeks to hold each

responsible for half of any exemplary damages award. The failure to address the six factors is more troubling. Although Kelly resisted discovery and offered to produce his tax returns to the Court (even though he never did), Plaintiff should have made some effort to at least provide some indication of the net worth of Defendants. Because exemplary damages serve to punish, an adequate punishment is often dependent on the financial means of the ones to be punished.

These matters cut against the imposition of exemplary damages in this case. That Defendants acted maliciously does not mandate an award of exemplary damages. Furthermore, Texas law does not permit an award of exemplary damages "to a claimant who elects to have his recovery multiplied under another statute." *Id*. § 41.004(b). Through its request for treble damages, Plaintiff has arguably elected to have its recovery multiplied under the Lanham Act. *Cf. Spark Multinational, LLC v. Yong Xing Ltd.*, No. EP-22-CV-00030-FM, 2023 WL 2569441, at *5 (W.D. Tex. Mar. 17, 2023) (finding that § 41.004(b) precluded exemplary damages when the plaintiff had sought and obtained "multiplied damages under the DTPA"); *Puente v. State Farm Lloyds*, No. CV B-15-190, 2016 WL 1729532, at *5 (S.D. Tex. Mar. 28, 2016) (recommendation of Mag. J.) (recognizing that plaintiff "can either recover treble damages under [Tex. Ins. Code] § 541.152(b) or exemplary damages, but not both") *adopted* by 2016 WL 1733472 (S.D. Tex. Apr. 29, 2016). Under such argument, the election precludes recovery of exemplary damages. The Court, furthermore, has enhanced Plaintiff's damages under the Lanham Act by increasing actual damages with a two-times-actual-damages multiplier.

The Court, however, need not and does not rely on § 41.004(b) to preclude recovery of exemplary damages. It merely notes the potential interplay between federal and state law. The Court instead relies upon its sound discretion to find that exemplary damages are not warranted for at least two reasons. First, Plaintiff has not addressed the six factors of § 41.011. While some of these factors may favor an award of exemplary damages for Defendants' conduct, others may not. The factors guide courts in assessing the amount of exemplary damages. The Court declines

to speculate when Plaintiff could have addressed the factors in its motion when it requested exemplary damages. Even though Defendants have engaged in sanctionable conduct resulting in the entry of default judgment, exemplary damages focus on other factors.

While not presented for this purpose, the Court's review of the deposition transcript of Rico Guerrero provides some evidence regarding the financial means of Defendants. RIO was created in 2019. Tr. 334:19-20 (Ex. E to ECF No. 146-1). Guerreo joined the company in 2022. Tr. 335:7-8. Before he was with the company it "generated approximately 6 to 7 million dollars" in revenue, and with a "profit margin" of about "70 percent . . . they made some decent money." Tr. 339:17-25. He remained with RIO until it was terminated. Tr. 350:13-15. When RIO filed its certificate of termination, it did so at Kelly's direction because "there was no revenue being generated and no business being done in the U.S." Tr. 356:24-357:7. Kelly wanted to file the certificate at least in part because he believed "that if there's no company in the U.S., then there is no more jurisdiction . . . no more action that can be taken if the company no longer exists." Tr. 358:6-15. When Guerrero left RIO he did not receive any distribution because Kelly said "there's no funds" and Guerrero believed him. Tr. 360:6-361:12. While Kelly's net worth is uncertain, it appears that RIO is no longer solvent.

Second, were the Court inclined to consider awarding exemplary damages despite Plaintiff's failure to address the § 41.011 factors, two factors—"the situation and sensibilities of the parties concerned" and "the net worth of the defendant"—could favor minimal, if any, damages above those to compensate Plaintiff for its losses. For Defendants, it seems that a judgment for actual damages is no small matter. Adding to that judgment for the express purpose of punishing Defendants appears unwarranted despite their conduct leading to and during this case. Their conduct during the case has already resulted in the harsh sanction of default judgment. Viewing the totality of the circumstances, the Court declines to impose exemplary damages.

## E. Attorney Fees

Plaintiff also seeks attorney fees under the Lanham Act. Mot. at 42-44. "Under our judicial system, the prevailing party normally may not recover attorneys' fees absent statutory authority." *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 65 (5th Cir. 1992). This means that "a party is not penalized for defending or prosecuting a lawsuit when that party has a good faith belief in its position." *Id.*

For "exceptional cases," the Lanham Act does provide courts with discretionary authority to "award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "The prevailing party has the burden to demonstrate the exceptional nature of a case by clear and convincing evidence." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996). While a case may be exceptional when violative conduct is properly "characterized as malicious, fraudulent, deliberate, or willful," some courts "require a showing of a high degree of culpability," such as "bad faith or fraud," whereas others go so "far as to require very egregious conduct." *Id.* (citations and internal quotation marks omitted).

More recently, however, for purposes of the Lanham Act, the Fifth Circuit has adopted the Supreme Court's definition of "exceptional" as used in the Patent Act. *See Baker v. DeShong*, 821 F.3d 620, 622-25 (5th Cir. 2016). Thus, for purposes of § 1117(a), "an exceptional case is one where (1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an 'unreasonable manner.'" *Id.* at 625 (quoting *Octane Fitness, LLC v. Icon Health and Fitness, Inc.*, 572 U.S. 545, 554 (2014)). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness*, 572 U.S. at 554. Courts should exercise their equitable discretion in light of the considerations identified by the Supreme Court, not under any perceived "precise rule or formula." *See id.* (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534

(1994)). Notably, this is consistent with Fifth Circuit precedent dating to 1992. *See CJC Holdings*, 979 F.2d at 65 (defining the term "exceptional" within § 1117(a) consistent with 35 U.S.C. § 285 and holding that courts "should decide whether a case is exceptional by examining all the facts and circumstances").

As with § 285 at issue in *Octane Fitness*, § 1117(a) "imposes one and only one constraint on district courts' discretion to award attorney's fees in . . . litigation [under the Lanham Act]: The power is reserved for 'exceptional' cases." 572 U.S. at 553. This means that courts have no discretion under § 1117(a) to award attorney fees for cases that are not exceptional. But it does not mean that courts must award attorney fees if it finds the case exceptional. Had Congress wanted to mandate fees, it would have stated that courts "in exceptional cases shall (instead of may) award reasonable attorney fees to the prevailing party." Congress provided for mandatory fees under § 1117(b) absent "extenuating circumstances," yet it only provided discretion to award fees under § 1117(a). Finding the case to be exceptional is a prerequisite to the Court exercising its discretion under § 1117(a). "After the prevailing party" has shown "the exceptional nature of the case," the "district court, in its discretion, may award attorneys' fees." *CJC Holdings*, 979 F.2d at 65. The amount of fees does not become an issue until the Court finds the case to be exceptional and decides to "exercise its discretion to award attorneys' fees." *Id.* at 66.

When Plaintiff commenced this case, it seemed unusual only to the extent that a company from Denmark was suing a Texas company and its owner for acts that occurred in Indonesia. While both sides were represented by counsel the case did not stand out from similar cases with respect to the substantive strength of Plaintiff's litigating position. While both sides had legal representation, the Court cannot find that Defendants litigated the case in an unreasonable manner.

However, Defendants' manner of litigation changed once they decided to proceed without legal counsel. As mentioned earlier, at that point, this case seemed to take a turn for the worse as to how Defendants litigated it. That decision ultimately placed RIO into default for not having

legal representation. And without the skill of retained counsel, Kelly did not match Plaintiff's ability to present evidence and to make convincing arguments. Of course, that questionable decision does not excuse or justify Kelly's conduct. But it is relevant to an award of fees determined under the totality of the circumstances. The unreasonable manner in which Defendants litigated this case, and the accompanying sanctionable conduct, justifies entry of default judgment.

The question now becomes whether the Court views that manner of litigation as necessarily justifying an award of fees also. Defendants have litigated this case in an unreasonable manner. But their unreasonableness is precisely why the Court is now issuing default judgment as a sanction. Under the facts of this case, it seems to be overkill to impose the most severe sanction upon Defendants for their unreasonable and sanctionable conduct and then to add attorney fees through the entered default judgment for essentially the same conduct. The Court declines to hold that such manner of litigation necessarily justifies an award of fees under § 1117(a) under these facts.

Defendants' choice to proceed without counsel also changed the dynamics between the parties. Not only did Plaintiff seem to be more financially prepared for litigation, but it also had the clear benefit of superiority of legal counsel. Thus, as the case proceeded, the substantive strength of Plaintiff's litigating position seemed to become more pronounced. Ultimately, however, it was not the strength of Plaintiff's position that resulted in victory. It was instead Kelly's sanctionable conduct in conjunction with well-pleaded factual allegations that the Court accepted as true given Defendants' defaults. This is not to say that Plaintiff may not have had a strong case regardless. But, under the totality of the circumstances, the strength of its case is not sufficient for the Court to find this case exceptional under § 1117(a).

## F. Pre- and Post-Judgment Interest

Plaintiff also moves for an award of pre- and post-judgment interest. Mot. at 42. More particularly, it seeks such interest "at the rate prescribed by 28 U.S.C. § 1961(a), beginning October 1, 2021. *Id*. at 44. Through its motion, it only seeks interest under federal law even though it

premises jurisdiction in this case on both federal question and diversity jurisdiction. *See* ECF No. 35 ¶¶ 5-6. Not many courts have addressed such dual jurisdictional bases as they relate to awards of prejudgment interest, and the Court's independent research has uncovered only one circuit court and five district court decisions, although there could be others. *See Alhassid v. Bank of Am., N.A.*, 688 F. App'x 753, 761 (11th Cir. 2017) (per curiam); *Mooney v. Roller Bearing Co. of Am., Inc.*, No. 2:20-CV-01030-LK, 2023 WL 6979640, at *3-6 (W.D. Wash. Oct. 23, 2023); *Rhoten v. Rocking J. Ranch, LLC*, No. CV 21-46-M-DLC, 2022 WL 17128639, at *1-2 (D. Mont. Nov. 22, 2022); *Mandelbaum v. Vo*, No. CV 11-02835-MMM (RZx), 2012 WL 13008419, at *8-9 (C.D. Cal. Nov. 15, 2012); *Warfield v. Alaniz*, No. CV 03-2390-PHX-JAT, 2007 WL 2051535, at *2-3 (D. Ariz. July 16, 2007); *ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*, No. 96 Civ. 6033(BSJ), 1999 WL 595450, at * 11 (S.D.N.Y. Aug. 6, 1999).

Like the district court in *Alhassid*, this Court has "both diversity and federal question jurisdiction," and the relevant circuit—the Fifth Circuit in this instance—has "not determined whether state law or federal law governs interest on prejudgment interest in that circumstance." *See* 688 F. App'x at 761. When five of six asserted claims are "based in state law," and the court awards fees and costs based upon a state statute, the district court has discretion to find "that the interest rate should be governed by state law." *See id*.

But that does not mean that a court abuses its discretion were it to apply federal law regarding the interest rate. Indeed, the lesson from the district courts who have addressed the matter is that the court "may exercise its 'discretion to apply the federal pre-judgment interest standard'" in such circumstances. *Rhoten*, 2022 WL 17128639, at *2 (quoting *ECDC Envtl.*, 1999 WL 595450, at * 11 and citing *Warfield*, 2007 WL 2051535, at *3); *accord Mooney*, 2023 WL 6979640, at *4 (quoting *Rhoten* while citing *Mandelbaum*, 2012 WL 13008419, at *9).

The circumstances here do not require a deep dive into this matter. When a party moving for default judgment as a sanction relies only on federal law for pre- and post-judgment interest

and damages are warranted under both state and federal law, it is within the Court's sound discretion to apply federal law on the issues of pre- and post-judgment interest.

Plaintiff is entitled to post-judgment interest under federal law. *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."). "Post-judgment interest is awarded as a matter of course." *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010). This is not a matter of discretion. *Id*.

The Fifth Circuit is not as clear about prejudgment interest. But it has stated that § "1961 fixes the rate of *prejudgment* interest only when it is a federal question that must be governed by federal law." *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1209 (5th Cir. 1993). Plaintiff argues that "pre-judgment interest under the Lanham Act 'is within the discretion of the trial court.'" Mot. at 42 (quoting *LidoChem, Inc. v. Stoller Enters., Inc.*, No. 1:09-CV-204, 2016 WL 9281944, at *3 (W.D. Mich. Jan. 5, 2016)). "The Fifth Circuit has not spoken on when prejudgment interest ought to be awarded for violations of the Lanham Act." *Lowe v. Eltan, B.V.*, No. 9:05-CV-38, 2018 WL 7822940, at *11 (E.D. Tex. Dec. 12, 2018) (recommendation of Mag. J.) *adopted in part*, 2019 WL 493806 (E.D. Tex. Feb. 8, 2019).

While multiple approaches have developed over the years, "district courts within the Fifth Circuit have elected to follow the Seventh and Tenth Circuit's approach, finding it to be more persuasive than the approach of the Second Circuit." *Id.* at *11 (citing cases). Under that approach, "prejudgment interest should be presumptively available to victims of federal law violations." *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 712 (S.D. Tex. 2013). This is so because without prejudgment interest, "compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Id*. An "award of prejudgment interest is especially appropriate" in cases where defendants have "delayed the suit, to the Plaintiff['s] detriment," whether that delay is by not filing an answer or seeking proper counsel. *Exxon Mobil Corp. v. Exxonmobil for Exp., Imp. & Trade Ltd.*, No. 3:12-CV-01122-P, 2013 WL 12124589, at *5 (N.D. Tex. Aug. 23, 2013).

The same is true for sanctionable delays as has been found in this case.

Whether prejudgment interest is presumptively available or merely discretionary, the Court finds that it is warranted on the facts of this case. Given the defendants' clear record of delay and evasive conduct, an award of prejudgment interest to Plaintiff is appropriate. Plaintiff asks the Court to use the rate set by § 1961(a). Although some courts have utilized "the prime rate or Treasury bill rate," others use "the average monthly prime rate from the date" claims accrued until the date of judgment. *See Lowe*, 2018 WL 7822940, at *12. Given Plaintiff's specific request and the Fifth Circuit statement in *Travelers*, the Court will utilize the § 1961(a) rate, i.e., the "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of judgment," which as of today is 3.95%.

"As a matter of convenience and practicality," courts should determine the amount of prejudgment interest as "allowed by the law of the forum state." *West v. Harris*, 573 F.2d 873, 884 (5th Cir. 1978). Although *West* also applied the state interest rate, Plaintiff here requests the federal rate while not addressing how the Court should calculate the amount of interest. "Prejudgment interest is simple, not compound" in Texas. *Capio Funding, LLC v. Rural/Metro Operating Co., LLC*, No. 3:17-CV-2713-X, 2024 WL 4229289, at *3 (N.D. Tex. Sept. 18, 2024) (citing Tex. Fin. Code § 304.104); *accord Medina v. Fed. Janitorial Servs., Inc.*, No. EP-12-CV-350-PRM, 2013 WL 8480147, at *7 (W.D. Tex. Sept. 24, 2013) (applying simple interest to prejudgment interest calculated under Texas law).

When calculating the amount of prejudgment interest on percentage per year, the proper calculation is the amount of prejudgment damages (here $516,834) multiplied by the annual interest rate (here 3.95%) divided by 365 to obtain amount of interest per day (here $55.93). *See Capio Funding*, 2024 WL 4229289, at *3. That daily amount is then multiplied by the number of days from the day damages accrued until the day before judgment. *See id*. Plaintiff reasonably seeks

prejudgment interest from October 1, 2021, which is 1,089 days as of yesterday—the day before entry of judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** *Plaintiff ReSea Project APS's Motion for Sanctions and Grant of Default Judgment and Permanent Injunction Against Both Defendants* (ECF No. 146). Defendants have engaged in sanctionable conduct that warrants entry of default judgment. Having considered the various damages and other matters to be included in the default judgment, the Court **FINDS** that Plaintiff is not entitled to exemplary damages under Texas law or attorneys' fees under the Lanham Act, but is entitled to the following:

1. Permanent Injunction to be set out in a contemporaneously filed Default Judgment;

2. Economic damages of $172,278;

3. Noneconomic damages of $344,556 for reputational damages under the Lanham Act or Texas law;

4. Pre-judgment interest of $60,907.77; and

5. Post-judgment interest pursuant to 28 U.S.C. § 1961(a) compounded annually as required by § 1961(b).

Furthermore, costs other than attorney fees are assessed against Defendants. When a court enters "judgment against multiple defendants," the concept of "joint and several liability" comes into play. *See Honeycutt v. United States*, 581 U.S. 443, 447 (2017) ("If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount."). Because essentially the same damages could be warranted under both the Lanham Act and Texas law, the Court imposes the damages jointly and severally against both defendants.

**IT IS SO ORDERED this 24th day of September 2024.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**